Nott, J.,
delivered tbe opinion of tbe court:
This is an action brought to recover tbe proceeds of two hundred and sixty bales of cotton captured at Mobile, which proceeds, now in tbe Treasury, amount to $47,673 60. Tbe case has been twice tried. On tbe first trial tbe court decided that tbe claimant bad failed to make out bis title to tbe captured property, and dismissed tbe suit. (4 C. 'Ols. B., p. 611.) A motion for a new trial on freshly-discovered evidence was made and granted, and tbe case now comes up upon its rehearing. Considering tbe legal ability, tbe time, and tbe labor that have been expended upon it, it comes with facts singularly involved and confused, and may require a third trial before complete justice can be done.
Tbe claimant, resident in Baltimore at tbe outbreak of tbe rebellion, had been previously a merchant in Mobile. Thomas Henry, of that city, bad been for some years bis personal friend and business agent, selling bis property, collecting bis rents, and taking charge of bis affairs. Tbe claimant was also one of tbe trustees of tbe estate of John Henry,.deceased; and Thomas Henry was also a member of the firm of Thomas Henry & Oo. During tbe war tbe agent collected moneys belonging to bis principal and to tbe estate of Jobn Henry. Unable to remit these moneys, and seeking to protect them for the owners, be bought cotton. Tbe cotton was captured and sold, and the proceeds are in the Treasury.' On tbe former trial tbe court held as matter of law that tbe agent bad no authority during tbe war to invest tbe funds which be had collected in tbe captured cotton ; and, as matter of fact, that no ratification of tbe investment bad been given by tbe principal before its seizure. Tbe decision of tbe court went chiefly against tbe bona fide of tbe *347 transaction, bolding that the purpose of the parties was to enable the loyal one, under the guise of principal, to recover the proceeds of property which had been purchased and possessed by one who could maintain no action by reason of his disloyal acts. The evidence now produced shows a clear and distinct-written ratification of the agent’s purchases immediately after they were made and long before the capture took place. But this new evidence also shows that other parties were equitably interested in the purchase of the cotton, contributing funds, and giving an implied ratification. On the former trial the matters in doubt lay between the principal and the agent; on this, they lie between the trustee and his cestui que trust.
The law of the case has been learnedly argued, but it is-believed that nearly every proposition necessarily involved was considered and determined in the case of Bernheimer Brothers,. (5 O. Cls. B., p. 549.) That case, it was supposed, laid down a broad yet guarded rule, which would enable the northern citizen to seek what was equitably his own without opening the-door to transactions collusive and designed to enable the disloyal citizen to escape from the strict conditions of the statute. It was shortly followed by the decision of the Supreme Court in Grossmeyer',s Case, (9 Wall. B., p. 72.) When that case was-before this court, it had been held in effect that the commercial intercourse which the law forbade was actual and practical, not merely constructive or theoretical. It was thought that a loyal citizen of the North, acting in good faith and with no purpose to aid the rebellion, might simply save his property in the South by directing its investment there, provided that he sent nothing into the insurgent districts and brought nothing out. It was thought that the law did not compel the loyal citizen, merely because he stood on loyal territory, to watch the ruin of his property within the rebel lines with folded hands, but that it allowed him to protect his own, always, however, with the proviso that he left the resources of the rebellion precisely as as he found 'them. The Supreme Court thought otherwise, and held that a mere message through the lines from friend to friend, to invest money already in the South iu cotton, and hold it till the war should be over, was illegal, and invalidated all that followed.
In Bcüefs Case, (5 O. Cls. B., p. 70S,) this court was speedily thereafter asked to extend the severe rule of the Supreme Court to a northern citizen unwillingly detained within the insurrec- *348 tionary lines, and to bold' tbat because of bis legal residence 'be came under tbe same ban of non-intercourse, and acquired no title to tbe personal property tbat bis money bought. We thought tbat the rule of tbe Supreme Court was not one which •should be extended, and abode by our former decision. Tbe Supreme Court has not since extended tbat rule to any different case, and tbe question now before us is, shall this court do so %
Tbe differences between this case and Grossmeyer’s are these: There no agency existed at tbe time, nor before tbe war; tbe fund to be invested was a debt, and tbe debtor was the appointed ■agent. The communications, moreover, passed from North to South, from loyal to disloyal territory, and' directly across the military lines. Here tbe agency existed before tbe hostilities; the fund invested was money derived from tbe claimant’s own property, possessed by him in Alabama long before tbe rebellion began; tbe ratification was given after the agent bad left tbe insurrectionary districts, and- tbe communications passed only between England and the United States.
In this case there are two important chapters of law involved, yet they must not be erringly intermingled. The one is public in its nature, to restrict and make criminal all intercourse between enemies; tbe other is private, to govern tbe rights and obligations of principal and agent. If under tbe former tbe act of an agent were illegal, no ratification by a private person, though tbe agent’s principal, could make it lawful ,• being forbidden by law, it would be wholly and always void. If, on tbe contrary, tbe act was not forbidden by law, then tbe question would arise under the law of agency, whether it bad become binding upon the principal.
Tbe general rule of law undoubtedly is that all commercial intercourse between two enemies is unlawful; tbat war dissolves partnerships, annuls agencies, revokes powers, and makes every person in tbe one country tbe enemy of every person in tbe other. But there is one distinct exception declared by American courts, including tbe highest, which does allow tbe one belligerent to act for the other, provided always tbat it be without intercourse; for it has been decided that during hostilities a citizen may pay to a resident agent his debt due to an alien enemy, and that tbe agent may accept tbe money and bind tbe principal, Ward v. Smith, (7 Wall. R., p. 448.) It follows tbat neither the paying nor the receiving was commercial *349 intercourse, and tliat tbe moijiey lawfully became, eo instanti,. tbe x>roperty of tbe principal. If now tbe law of non-intercourse, both international and statutory, allows tbe agent to-turn tbe property of bis principal from a chose in action into money, wbat is there to forbid bis turning it from money into personal property? It is said that tbé terms of tbe agency, tbe power of attorney, tbe previous authority exercised and permitted, did not allow him to invest. True; but tbe terms of tbe agency and tbe powers of tbe agent can neither enlarge nor affect the law of non-intercourse. Whether such an investment was within tbe terms of tbe agency; whether without-ratification it would bind the principal; whether, amid tbe circumstances, tbe agent would be relieved from personal liability, are questions involving tbe law of principal and agent, and not-to be confounded with tbe principles of international law. Tbe illegal act, according to all tbe authorities, was not in paying tbe money, nor in receiving it -, but would have been in transmitting it to tbe alien owner.. (Ward v. Smith, supra.) There is no authority which bolds that it would be illegal for an agent, who lawfully received money to honestly protect it by investment. If tbe law of non-intercourse allows tbe alien enemy to become tbe owner of tbe money thus paid, precisely as any other creditor may, then there can be no substantial reason why be cannot, like -any other principal, follow bis money and become tbe owner of tbe property into which it has been turned.
But all tbe reasoning that would defeat a recovery in this case rests upon authorities which, in their turn, rest upon facts of actual alienage. If Alexander Stoddart bad been tbe actual alien enemy of tbe United States, instead of their resident loyal citizen, these authorities would be in point and this reasoning applicable; or if tbe late rebellion bad been successful, and he were now prosecuting his claim before some Confederate tribunal, tbe attorney general of tbe Confederate States would urge against him precisely tbe same authorities that are relied upon by tbe law officers of bis own government. And the confederate attorney general might well argue that it was against tbe interests of tbe Confederate States to kllow northern debts to be thus shielded from confiscation, and against-their policy to allow alien enemies to acquire property within their borders. But in this case there was neither alienage nor-aught done by tbe claimant against tbe interests or policy of *350 tbe United States. He never took upon himself the risks of an alien; he left his property within his own country when he left it in Mobile, and entitled to the protection of its laws; and it seems to me that it would be a perversion of principles and authorities for courts of the United States so to apply them that the rebel debtor might pay his debt and save his interest, and the rebel agent might receive the money and bind his principal, but that the loyal citizen should neither acquire interest on the money so paid, nor be allowed to follow it in the property in which it is invested. Such a ruling would bind him so far as the acts of his debtor and agent were to their own benefit, and desert him so soon as they' were exercised for his protection.
At the first trial of the case there was no suggestion of any interest in the captured cotton existing, save that of the claimant in his individual right. Mr. Henry was examined as a witness, and he testified: “ As Mr. Stoddart’s agent I received (including $5,000 due him by myself) about $30,000, between 1st April, 1801, and 1st June, 1865.” “ Of this sum, between $0,000 and $7,000 was received for rents on real property belonging to the claimant, and about $18,000 was received for sales of real estate made by me for him, and which real estate I conveyed by deed in 1858 and 1859, and collected the pay for it in years 1801,1S02, and 1803. The funds received by me for sales of real estate were Confederate money, and so were all collections made for him.” This statement about Confederate money he repeated on his cross-examination. The fact is not important, for later he shows that when the first purchases of cotton were made Confederate money was u about equal to gold,” but when a large part of the collections were made, in 1801, Confederate money had not come into existence. Doubtless the witness collected the money in current bank notes, deposited them in bank, and, when he came to invest, could only procure from the bank Confederate money.
With this Confederate money, no matter how acquired, Mr. Henry purchased cotton as the agent of the claimant and on his account. It was purchased at various times from March 26, 1862, to February 7,1803, at prices varying from 6 to 15 cents per pound, and amounting in the aggregate to $18,866 62. Being brought to Mobile in 1863, it was stored withN. W. Perry & Co., separate and apart from any cotton of the agent’s, but *351 was marked with the name of bis firm, Thomas Henry & Oo. 'The object of so marking it was to save it from confiscation. On the capture of Mobile, the cotton was seized by the United States forces. It was reported to be the property of Thomas Henry & Oo.; but as neither the agent, Henry, nor the claimant, Stoddart, was then at Mobile, this fact has not the significance upon the question of ownership which it had in the leading cases of Grossmeyer and of Bramhall.
By the evidence produced on the second trial certain additional facts are disclosed. First, Mr. Henry, in a letter to the claimant, written at Matamoras April 15, 1865, says: “I do now recollect how much I invested for you, but it toas all the money of yours and Mrs. Henry's I had on hand at the time.” “ As near as I can recollect, it toas somewhat over $20,000. I have done the best I could to protect both [your] and Mrs. [John] Henry's interests.” In the same_ letter lie speaks of the cotton that “ I purchased from the moneys collected for you, mid Mrs. Henry.” Again he adds I can only say the cotton is yours and Mrs. Henry’s — teas bought with your and her money, which at the time 1 thought best for both your interests.”
On the part of the claimant there was no disavowal of his agent’s acts or statements. He wrote on the 31st of July, 1863, approving all that he had done, and at the same time referring him to Mrs. Henry, then in Europe, for all information. He wrote' again, on the 2d September, to one of his co-trustees, that Mrs. Henry had just returned; that she had conferred with the agent in England, and that what was invested in cotton might turn out very well or might end in smoke. He wrote also to a creditor of the trust estate, on the 3d September, that Mrs. Henry had met the Mobile agent, and that everything had been done “ for our interest that the state of affairs would admit.”
It appears, among several deeds and mortgages that are in evidence, that the trustees of the estate of John Henry conveyed a plot of ground in Mobile to one Dominick Q’G-rady, the consideration .whereof was $14,000. . At the same time the claimant also conveyed an adjoining plot for $7,500. The two sales were made by the agent, and constituted but one transaction. One mortgage was given by the purchaser to the two sets of grantors jointly for $19,100, to secure the unpaid bal.ances of the purchase. A part of this purchase-money, secured *352 thus by tbe mortgage, fell clue in January, 1862, and was collected by the agent, whereof $3,306 belonged to the estate, and entered into the cotton purchases'whicl^he, the agent, made.
To this objection, that thejtrust estate of John Henry contributed to the purchase of the cotton and is jointly interested in its proceeds, the counsel for the claimant returned two answers, which we will consider separately:
First, he said that, as a matter of fact, more money belonging to the claimant is shown to have come to the agent’s hands than the amount invested in cotton. He states his account thus:
From the sale of real estate. $9,630
From rents collected by the agent. 6,000
From the agent, for his own debt... 5, 009
20, 630
We are constrained to say that we cannot accept the statement, and that it is overthrown by the evidence. For, first, it appears that but $18,866 went into cotton, being all the moneys then in the hands of the agent, of which at least $3,306 belonged actually to the Henry estate; and, secondly, it is shown by the testimony of the agent, already quoted, that some, if not all, of the rents belonged to the same estate; and, thirdly, -we find in the first letter of the agent to the claimant, written after the cotton was purchased, and after the writer had left Mobile, reference to his mortgage to secure his own indebtedness of $5,000, with a promise that it should be recorded, and making no pretense of having paid the debt by investing it in cotton.
After a protracted examination'of the obscure and involved statements and insufficient data of the case, we are satisfied, and irrespective of this letter of the agent’s, that his $5,000 never entered into the purchase, but, on the contrary, that the $3,306 belonging to the trust estate did. And we are satisfied that the $18,866, invested in cotton, was made up as follows:
From the sale of the claimant’s real estate. $9,630
From rents collected by Henry.-. 6, 000
From the sale of the trust estate property. 3,306
18, 936
*353 As to the above rents, it appears that at least a part of them belonged to the trust estate, and it does not appear, save in the testimony of a witness whose heedless statements cannot be relied upon, that any part was really the property of the claimant.
Upon the evidence as it stands, we conclude that of the .$18,866 invested in the cotton, $9,630 belonged to the claimant and $9,236 to the estate of John Henry, and that these respective amounts are represented in this suit, the former by one hundred and thirty-three and the latter by one hundred and twenty-seven bales of the captured cotton.
We will consider now the second answer of the learned counsel, which raises the second legal question in the case.
It is insisted, 1st, that as the agent kept no account with the estate, but only with the claimant individually; and, 2d, that as the claimant had the exclusive management of the estate, with the assent of his co-trustees; and, 3d, that as the accounts related to matters which occurred after the death of Mr. John Henry, therefore the claimant might have brought the action in his individual name, though the whole of the money invested in the cotton had belonged to the estate. Certain authorities are relied upon to sustain this: Kane v. Paul, (11 Peters’s R., p. 33 ;) Foote v. Noland, (5 Cranch C. C. R., p. 399;) Green v. Hanburg, (2 Brock C. C. R., p. 403;) Callin v. Underhill, (4 McLean R., p. 337.) But these are cases which relate only to the ordinary rights and liabilities of executors; they do not reach the true difficulty of this case.
The ordinary actions of executors fall into two classes of cases: 1st, where property was sold by the testator, and there the action must be brought in the name of the executor; 2d, where property has been sold by the executor since his testator’s death, and there he may bring the action in his individual name or in his official character. The reason why the law compels the one and allows the other is because in the one case the debtor dealt with the testator, and should be liable only to his representative as such;.while in the other he dealt with the executor, and having to respond to him it can affect no interest and disturb no right, whether the latter elect to proceed in his individual or his official character.
But in these abandoned or captured property cases there is a new and confusing element, termed loyalty, which disturbs the relations of the parties, and renders inapplicable many well- *354 settled principles and forms and analogies of ordinary practice-Mr. Stoddart, moreover, appears in this case to have been something more than an executor, namely, a trustee. The terms and conditions and period and nature of the trust are not disclosed, yet it existed as long ago as January, 1859, as appears by one of the deeds in evidence. With regard to executors and administrators, we have already held that they come into court, strictly in a representative capacity, invested with all the equities, entitled to all the relief, and subject to all the disabilities, of their decedents. Therefore it has been decided that the loyalty or disloyalty of the representative could neither aid nor injure the estate which he represents; and it has at the same-time been decided that from the nature of things the loyalty or disloyalty of the distributees cannot be reached, and that they, like executors, must stand upon the character of the decedent. But with regard to trusts no case has yet been before the court.
There are several points of difference between trust estates, and those of executors and administrators. They are not transient, nor for a mere distributive purpose; the beneficiaries are certain and few; their interests are fixed, and can be made known to the court; in equity the cestui que trust is regarded as the owner.
The ruling of the court as to administrators, when applied to-property captured after the death of the decedent, and which, had morally become the property of the heir or the creditor at the time of its seizure in the hands of the- administrator, is-questionable; and when applied to the exclusion of the loyal heir or the loyal creditor is harsh; yet, from the nature of things, cannot be otherwise, for the court cannot, as a rule, know the distributees of such an estate; nor take proof as to-the loyalty of each; nor direct the application of the proceeds;. nor interfere with the final distribution of what comes to the-custody of the administrator. But it is not desirable that this-rule be pushed beyond it own necessity. Here is a trust estate created before the war begau. The testator’s loyalty is not in question, for his responsibilities had ceased ere the season of trial came; the trustees need not make proof of their own, for they are but agents who may be changed, and their legal estate-but a device of the law to protect the rights of others. Shall the beneficiaries make proof, or shall. a recovery be allowed under this statute, which requires proof of loyalty, without. *355 there being a particle of proof offered, as to any person, past or present, who owned the property at law, or is entitled to its proceeds in equity ?
The statute under which we act, and under which the party claims, requires not only proof of the ownership of thé captured property, but also u of his right to the proceeds thereof.” We find in the evidence that this party did not in fact own the funds which purchased this portion of the captured property; that their investment in the cotton was regarded by himself and co-trustees long before capture as an investment which should inure to the benefit of the trust estate; and th at the same ratification was given for this portion of the investment as for the other. Therefore we think he has shown for the unknown beneficiaries of that estate the same equitable title to one portion of the proceeds that will entitle him to recover for the other. He has not shown any liablity assumed by himself for the investment, nor can we assume his right to repay to the trust estate the small amount of the investment and take to himself the large amount of the proceeds. If it be said that the parties may arrange this matter among themselves, or make it tlie subject of adjudication in other courts, we must answer that they cannot thus elude the conditions of the statute. Grantiug that the single trustee, upon general principles, may maintain the action, it does not follow that he can retain the proceeds. Granting that there is a remote liability from the claimant to the estate for the acts of his agent, it does not follow that he can reap the profits which have accrued from the use of the trust funds.
Our conclusion is that the claimant may recover for the net imoceeds of one hundred and thirty-three bales of the captured cotton, amounting to $24,391 80, but not for the proceeds of the remaining one hundred and twenty-seven bales; that judgment be entered accordingly, unless the claimant elect within thirty days to have the case remanded to the docket, and give proof, 1st, as to the ownership of the rents collected by his agent and invested in the captured property; 2d, as to the nature and interest of the trust estate of John Henry, deceased ; 3d, as to the loyalty of the beneficiaries of that estate who may be entitled to receive, through their trustees, the proceeds of the captured property.